FRED P. FURTH, ESQ. CSB# 38438
**THE FURTH FIRM**
225 Bush Street, 15th Floor
San Francisco, CA 94104-4249
T: (415) 433-2070
F: (415) 982-2076
fpfurth@aol.com

ROBERT R. POWELL, ESQ. CSB# 159747
**THE LAW OFFICES OF ROBERT R. POWELL**
925 West Hedding Street
San Jose, California 95126
T: 408-553-0200
F: 408-553-0203
rpowell@rrpassociates.com

Attorneys for Plaintiff



IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

(San Francisco Division)

| | |
|---|---|
| ORALEE ANDERSON-FRANCOIS,<br><br>    Plaintiff,<br>v.<br><br>COUNTY OF SONOMA, CITY OF SANTA ROSA, JERRY NEWMAN, BRAD CONNORS OFFICER HOOD, JOHN FELMAN, Does 1-25 inclusive,<br><br>    Defendants. | Case No. C08 00724 WDB<br><br>COMPLAINT FOR VIOLATION CIVIL RIGHTS [42 U.S.C. 1983]<br><br><br>DEMAND FOR JURY TRIAL |

I.

**JURISDICTION AND INTRADISTRICT ASSIGNMENT**

1. **JURISDICTION.** Plaintiff brings this lawsuit pursuant to 42 U.S.C. Section 1983 to redress the deprivation by defendants, at all times acting under color of state law, of

1

Complaint
Anderson v. Sonoma County
U.S. District Court - Northern Dist (S.F)
Case No.

rights secured to plaintiff under the United States Constitution, including the First, Fifth, and Fourteenth Amendments.

2. Jurisdiction is conferred on this Court by 28 U.S.C. section 1343 (3) and 1343 (4), which provides for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. 1983. Jurisdiction is also conferred by 28 U.S.C. 1331 (a) because claims for relief derive from the United States Constitution and the laws of the United States.

3. **INTRADISTRICT ASSIGNMENT.** Venue properly lies in the Northern District of California, San Francisco Division, pursuant to 28 U.S.C. Sections 1391 and 1392 and Local Rule 3-2(e), in that the events and circumstances herein alleged occurred in Sonoma County, and at least one defendant resides in Sonoma County.

## II

## PARTIES

4. Plaintiff ORALEE ANDERSON-FRANCOIS (hereafter "ORALEE") at all times relevant herein, was a resident of Sonoma County, and the lawful adoptive parent of two children, E.A. (a female, DOB 6-29-95), and F.A. (a male, DOB 1-6-92).

5. Defendant COUNTY OF SONOMA (hereafter "COUNTY) is a municipality, organized and operating under the laws of California.

6. The Human Services Department ("HSD") is a COUNTY governmental agency organized and existing pursuant to the law and policies of defendant COUNTY, and the Family, Youth, and Children's Services, also known as Child Protective Services within the COUNTY, is an agency sub-unit of the HSD. The entities are collectively referred to herein as COUNTY, unless context requires further delineation.

2

Complaint
Anderson v. Sonoma County
U.S. District Court - Northern Dist (S.F)
Case No.

7. Plaintiff is informed and believes, and thereon alleges, that it was COUNTY which promulgated, encouraged, administered, and/or permitted, the policies, practices, customs, and procedures under which the individual defendant employees of COUNTY committed the acts or omissions complained of herein, and either intentionally or recklessly, whether as a result of policies, practices, customs, or procedures, or as a result of ineffective, non-existent, or inadequate training and education of employees, caused or were otherwise the driving force responsible for the acts or omissions of said defendant employees as complained of herein, and plaintiff allege that the policies, practices, customs, and/or procedures of COUNTY, as determined and effected in the circumstances complained of herein by the individual defendants, constitute and/or engender a circumstance and/or environment of deliberate indifference to the rights and safety of citizens of the community, of families, and of children such as E.A. and F.A.

8. Defendant JERRY NEWMAN ("NEWMAN"), whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon Plaintiff's information and belief, a social worker, employed by COUNTY.

9. Defendant CITY OF SANTA ROSA (hereafter "CITY") is a municipality, organized and operating under the laws of California.

10. The Santa Rosa Police Department ("SRPD") is a governmental agency organized and existing pursuant to the law and policies of defendant CITY. The entities are collectively referred to herein as CITY, unless context requires further delineation.

11. Plaintiff is informed and believes, and thereon alleges, that it was CITY which promulgated, encouraged, administered, and/or permitted, the policies, practices, customs, and procedures under which the individual defendant police officer employees committed the

acts or omissions complained of herein, and either intentionally or recklessly, whether as a result of policies, practices, or procedures, or as a result of ineffective, non-existent, or inadequate training and education of employees, caused or were otherwise responsible for the acts or omissions of said employees as complained of herein, and plaintiff alleges that the policies, practices, and/or procedures of the CITY, as determined and effected by the individual defendants and other police officers of SRPD, constitute and/or engender a circumstance and/or environment of deliberate indifference to the rights and safety of citizens of the community.

12. Plaintiff is informed and believes, and thereon alleges, that the CITY has no training on the rights of familial association, the existence and use of protective custody warrants pursuant to California law, and the relevance of federal laws and precedent on the removal of children from their parents / guardians in the context of an investigation of a child abuse referral.

13. Defendant BRAD CONNORS ("CONNORS") whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon Plaintiff' information and belief, a police officer employed by CITY.

14. Defendant OFFICER HOOD ("HOOD" – Badge #314), whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon Plaintiff' information and belief, a police officer employed by CITY.

15. Defendant JOHN FELMAN ("FELMAN"), whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon Plaintiff' information and belief, a police officer employed by CITY. Plaintiff is further informed and believes that FELMAN is an acting supervisor of defendants CONNORS and HOOD.

4

Complaint
Anderson v. Sonoma County
U.S. District Court - Northern Dist (S.F)
Case No.

16. Plaintiff is informed and believe and, based upon such information and belief, alleges that, at all times herein mentioned, each and every defendant was the agent and/or employee of their co-defendants, and was acting either in their individual capacity or in the scope, purpose and authority of COUNTY and/or CITY, and/or in their employment or agency with said entities, and with the knowledge, permission, ratification, and/or consent of said co-defendants and/or entities.

17. Plaintiff is informed and believe, and thereon alleges, that each of the named individual defendants herein, did knowingly and willingly, with a common intent and scheme set forth in further detail herein below, conspire to injure plaintiff, and deprive plaintiff of her rights, liberties, and interests, as such rights are afforded under the United States Constitution, and the California State Constitution, and conspired generally to damage said plaintiff and inflict great injury upon her.

## III.

## FACTUAL ALLEGATIONS

18. ORALEE was a licensed foster mother for over two decades at the time of the events alleged in this complaint. She had adopted eight children, including E.A. and F.A., had been a guardian of another child, and had nine biological children of her own as well.

19. Over a period of approximately 25 years, she had provided care for over 100 foster children, many of whom had significant psychological maladies, special needs, and/or disabilities.

20. ORALEE was an attentive, loving, and caring mother who did her best to secure a good education for each of her children, whether biological or adopted. She participated

5

Complaint
Anderson v. Sonoma County
U.S. District Court - Northern Dist (S.F)
Case No.

regularly in their school activities, provided for extracurricular activities and as a devout Christian, ensured the family and all of its members attended church regularly.

21. Pursuant to California law, for each of the foster children placed with her, whether temporarily, by guardianship, or up to an adoption by her, there was at least one social worker per child who was required to make monthly visits with the child, and this was in addition, the general and recurring oversight of social workers from COUNTY working in the licensing unit of the HSD.

22. Two of the children adopted by ORALEE, Mark and Lucas, became rebellious, drug-using, pornography consuming young men as they entered their 17th and 18th years of life. They engaged in a number of criminal activities, and Lucas was eventually jailed for crimes he had committed.

23. When Mark was still 17 years of age, he began running with an unsavory crowd, staying out late, staying away from the home, and regularly using drugs. Eventually, in approximately February of 2005, he began to live with another family; however, they asked him to leave in April. He then lived with another family, until about August, when he began to live with another family (Cunninghams) in Santa Rosa, and refused to return to the family home altogether.

24. In December, Lucas also left the family home and began to live at the Panoski's. Lucas was not stopped from, and may have been allowed in the Panoski home, to smoke pot, view pornography, skip school, and engage in other activities that were anti-thetical to the rules and mores in ORALEE's home. Both of the boys' grades in school began a downward spiral after they left ORALEE's home.

6

Complaint
Anderson v. Sonoma County
U.S. District Court - Northern Dist (S.F)
Case No.

25. ORALEE, concerned that the Panoskis seemed willing to withhold the child, even called the police herself, filing a missing persons report, and thereafter, in mid-December the police responded to the Panoski home, however, they refused to intervene to remove the child because they refused to go to their mothers.

26. On December 15th, 2005, the Panoskis took both Mark and Lucas to a CPS office in Sonoma County, and both boys made a report to CPS alleging that they had been abused by their mother.

27. The referral alleged physical beatings of the boys, including whippings with a belt and/or extension cord, and other claims of physical and/or emotional abuse.

28. Although the COUNTY policy allows for coding responses as "immediate response," which would require a social worker to investigate immediately, the referral was coded as a "10 day response," meaning that the assigned social worker had up to ten days to commence an investigation pursuant to COUNTY policy.

29. Lucas would later claim on December 21st, 2005, that he had previously told school teachers about his "situation" [of being abused] with his mother, and Mark would say on the same day that he had told a counselor and a school teacher about the alleged beatings in his mother's home, yet there are know other known CPS reports from school teachers or counselors of such claims of abuse from Mark and Lucas, and yet all school teachers and counselor/therapists in California are mandated reporters.  ORALEE had maintained a single family physician for all the children for almost two decades, and this mandated reporter also never saw anything justifying a report of abuse to CPS.

7

Complaint
Anderson v. Sonoma County
U.S. District Court - Northern Dist (S.F)
Case No.

30. The matter was not assigned to anyone, until December 19th, 2005, when NEWMAN received the case. NEWMAN never attempted to contact, nor contacted, the long time family physician at any time prior to removing the children, as described hereinbelow.

31. On December 21st, 2005, NEWMAN met with both Mark and Lucas, and was told the boys stories of ritualistic whippings with a belt and/or extension cord, scaldings with hot water, nighttime beatings with these items that were unannounced and would occur in their bedrooms even though another child in the house might be present.

32. Mark claimed a beating of one kind or another happened "every day" but that he had no visible scars.

33. On December 21st, 2005, NEWMAN also spoke with an adult daughter of ORALEE's named Vanessa, who did not live with ORALEE and had not for just over two years at the point of the interview. In this interview, Vanessa claimed that she too had been "whipped" with an extension cord, and added some other claims. Vanessa claimed that one time she was upset because someone had eaten all the pizza she had brought home from work and left none for her, and somehow, an argument ensued about this pizza with resulted in ORALEE holding a gun against her head and tell her to move out of the home in 15 minutes.

34. Vanessa also claimed ORALEE had hit another child in the home (Christopher) with a gun on the head, though no specific time was given when this alleged incident occurred.

35. The next day, December 22nd, 2005, NEWMAN went to the home of ORALEE and interviewed her. While he was in the home E.A. and F.A. got in an argument, and he noted in his report that ORALEE settled the dispute appropriately.

8

Complaint
Anderson v. Sonoma County
U.S. District Court - Northern Dist (S.F)
Case No.

36. ORALEE denied using a belt or extension cord, and complained of racial overtones in prior abuse investigations that had happened in her home over the years. In fact, there had been 8 prior referrals regarding abuse received by the COUNTY licensing department, and 7 prior referrals for abuse made to CPS, and yet not one had ever been deemed to be substantiated in the years from 1990 to 2003. NEWMAN knew about the existence and disposition of these referrals at the time of his December 21st, 2005 interview of Mark, Lucas, and ORALEE.

37. After speaking with ORALEE, he asked if he could speak with E.A. and F.A. alone, and ORALEE agreed. NEWMAN questioned the children, noting that E.A. was clean and well-groomed, her affect was appropriate, and she was cooperative, although "at times" guarded. He noted that F.A. was tall and slender, had a big smile on his face and a happy affect throughout the interview. NEWMAN also described F.A. as being "delayed and behaviorally immature."

38. NEWMAN asked the children directly what it was like living there, and both children told him it was "nice" and that they "liked living [with ORALEE]." When asked what would happen to them if they did something really naughty, NEWMAN reported to the juvenile court that F.A. said that his mother gets a folded extension cord and "whips them with it." F.A. later denied ever saying he was hit with an extension cord, and NEWMAN recorded that even if hit with an extension cord, the children said the last time it had happened was in the summer.

39. NEWMAN, the very next day, stated to a lady named Phillips from the licensing unit of the COUNTY that E.A. had told him the last time anyone had "whipped" was a year prior.

9

Complaint
Anderson v. Sonoma County
U.S. District Court - Northern Dist (S.F)
Case No.

40. On December 22nd, 2005, NEWMAN and Phillips had a meeting with FELMAN at the SRPD, to discuss the possible need to remove E.A. and F.A., from ORALEE's home. NEWMAN and Phillips then went to ORALEE's home to discuss the allegations with her again. ORALEE informed them that she had learned since her meeting with NEWMAN, that both Mark and Lucas were now failing in school, and that Lucas was about to get kicked out of school entirely. ORALEE volunteered lots of information on the backgrounds of both boys, and other children she had raised. NEWMAN and Phillips left, and did not remove E.A. or F.A.

41. NEWMAN then had a chance encounter with ORALEE, E.A. and F.A. in a supermarket on January 3rd, 2005, and F.A. greeted him. He asked the children how Christmas went, and they said "good." He also learned from ORALEE, that Vanessa, the older daughter who he had interviewed on December 21st, had gone to her mother's house and "apologized." NEWMAN told her he would contact her later that evening to advise her as to what was going on with his investigation, as ORALEE was complaining, as she had in a phone call to NEWMAN on December 29th, 2005, that her boys Mark and Lucas needed to be returned home.

42. NEWMAN did not call ORALEE on January 3rd, 2006.

43. Thereafter, on January 5th, 2006, NEWMAN went to E.A.'s school and interviewed the school principal (Ms. Christiansen). The principal told him that E.A. had good attendance and satisfactory academics, but was a bit bossy with other kids. She told NEWMAN that ORALEE is a very attentive parent who attends all the parent teacher conferences, and sometimes comes to the school and initially disagrees with school personnel about a possible problem with the E.A.'s academics or behavior, but that she

will eventually listen to what is being said. The principal denied having ever heard anything about any "whippings" or seeing any marks or bruises on any of the children, and indicated she knew several of the Anderson-Francois children from her time at her present school, and her prior school.

44. NEWMAN then met with E.A. again at the school, noting she was clean and well groomed, or normal affect and with a slight but noticeable speech delay. E.A. denied there had ever been any "whippings" and said she was spanked in the past, but a "long time ago." Age appropriate spanking on the buttocks is lawful under California law.

45. NEWMAN asked E.A. about why her adult siblings had left the home of ORALEE, and E.A. said it was because they did not want to "follow the rules."

46. Also on January 5th, 2006, NEWMAN re-interviewed Mark and Lucas, who again told the same stories of abuse by whippings, being lined up to take turns getting spankings or whippings, a claim that one of the other children had been scalded on the stomach with hot water by ORALEE, and basically everything they had said before.

47. NEWMAN then went on January 17th, 2006, to re-interview F.A. at his school. When asked about his alleged prior statement of receiving a "whipping" with an extension cord, F.A. told NEWMAN he didn't even know what the word "whipped" meant. When explained by NEWMAN, F.A. denied that he had ever been "whipped," and said that the last time he spoke to NEWMAN, he had lied. He also told NEWMAN that he doesn't know of anyone in the house ever being hit. NEWMAN accused F.A. of lying, by asking him if someone had told him not to talk with him or talk about "whippings." F.A. said no one had talked with him about that.

48. That same day, January 17th, 2006, NEWMAN made an unannounced visit to another of ORALEE'S foster children, Terrisha. She said she did not want to get involved, but opined that the older boys should just return home until they were 18. She said there was some hitting for punishment when she was there, but would not characterize them as "whippings." Later that same day Terrisha called and told him that she personally speaks with E.A. almost every day and visits her too, and that it would "destroy" the children (E.A. and F.A.) if NEWMAN was to remove them from the only mother they had ever known. NEWMAN told her he hoped not to find a reason to remove the children.

49. The next day, January 18th, 2006, NEWMAN went to meet Lucas at his school, to address complaints by ORALEE that he had been missing school. Lucas denied missing school, saying he was more than 10 minutes late to some classes and the school called that an "absence." Lucas told NEWMAN that his teacher was telling him he should return to live with ORALEE.

50. NEWMAN asked if he recalled when the last time was that he was "whipped." Lucas said it was in September after school had started, and had to do with breaking some kind of picture frame. NEWMAN noted that Lucas' story about who resisted being spanked was inconsistent with Vanessa's story about being spanked, Lucas saying she resisted, and Vanessa saying she would just accept the alleged punishment. Lucas also said the only time he had seen a gun in the house was when he was 8 or 9 years old. Lucas said everything he was saying was true and he would testify about it when NEWMAN asked if he would testify in court with people asking him "hard questions."

12

Complaint
Anderson v. Sonoma County
U.S. District Court - Northern Dist (S.F)
Case No.

51. On January 19th, 2006, ORALEE called NEWMAN and told him that Mark had called her and asked her to "authorize" a tardy he had in school. She told NEWMAN she said she would, but hadn't told Mark when exactly she would do that.

52. While Lucas was at the Panoski's, he had been treated to several expensive gifts, and even taken on a trip to Hawaii, without the Panoskis ever asking the consent of ORALEE, or even advising her in advance. The Panoskis had told NEWMAN that they were interested in being the foster parents of Mark and Lucas, a position that would entitle them to certain monies for their care from the county.

53. On January 23rd, 2006, NEWMAN met with ORALEE and her attorney Dee Schilling, the latter questioning why the "investigation" was taking so long and advising NEWMAN that his repeated questionings of the children were having a harmful effect on the children. Schilling complained that NEWMAN's interviews were designed to elicit the answers he wanted (i.e. claims of abuse).

54. Then on January 26th, 2006, NEWMAN was contacted by a Kim Cunningham, who knew Lucas, and advised that Lucas had been caught not once, but twice in lies about some video games he had stolen from another child, and one that it was presumed he had stolen from a store, the only certainty was that he was lying about where he obtained the latter video game.

55. On January 30th, 2006, NEWMAN spoke with another adult children from ORALEE's home, Gabriel, who told NEWMAN that anything his mother may have done in the past was "punishment," and not "abuse." Gabriel also explained that his mother had taken into her home some of the "worst kids imaginable," and explained with regard to one of the children that he was aware that one child (Christopher) had been spanked with a belt,

but again likened it to "punishment" and not "abuse." Gabriel told NEWMAN that E.A. "never got punished," but he had seen her use an extension cord on a brother named Rodney, and the belt on some of the other kids. He told NEWMAN he had not lived in the home for a time period at least in excess of five years.

56. On the same day, January 30th, 2006, NEWMAN received a message from Ms. Cunningham, who had been housing Mark. She told him that she had asked him to clean up some things ("chores") and that Mark had started back talking to her, calling her "Massah," and so on, so she had kicked him out of the house and called the police. NEWMAN himself then went and picked up Mark and took him to school.

57. Then, two days later on February 1st, 2006, which was forty seven days after the initial referral by Mark and Lucas, 42 days after the first interviews by NEWMAN with Mark, Lucas, and Vanessa, 41 days after the first interviews with ORALEE, E.A., and F.A., 27 days after the second round of interviews with E.A., Mark and Lucas, 15 days after the second interview with F.A. and Terrisha, and 14 days after the second interview with Lucas, NEWMAN, FELMAN, CONNORS, and HOOD, jointly agreed that they would remove E.A. and F.A. from their mother's home, and further, that they would remove Mark and Lucas from the homes they had been staying in.

58. E.A. and F.A. had been residing with ORALEE the entire time of the six week investigation. The named defendants proceeded, without a warrant, without consent, and in the absence of any imminent risk of serious bodily injury, and removed the children that NEWMAN had been warned would be "destroyed" if they were removed from their mother. At or near the time of the removal of the children, NEWMAN told ORALEE in

14

Complaint
Anderson v. Sonoma County
U.S. District Court - Northern Dist (S.F)
Case No.

response to her assertions that the action of removing her children was unlawful, that it really didn't matter what she did because, as NEWMAN put it, "I always win."

59. When F.A. was brought to the shelter, he was inconsolable and needed immediate intervention by a licensed clinical social worker. Both he and E.A. told the social workers present at the receiving facility, including NEWMAN, that they did not understand why they were taken from their mother. E.A. told NEWMAN that no bad things happened, and again told him that she lived in a good home. NEWMAN also arranged, or personally participated, in the removal of Mark and Lucas from the home they were staying in, which by the time of the removal, was with the Panoskis for both, Mark having been kicked out of the Cunningham home. All children were then continued detained and out of the care of their mother thereafter, and remain out of her custody, despite the countless and repeated pleas of E.A. and F.A. to return to live with their mother. Mark and Lucas have "aged out" of foster care, Lucas has completed his jail sentence, and their exact whereabouts are unknown.

## IV. DAMAGES

60. As a result of the actions of the defendants herein, plaintiff suffered, and continues to suffer, severe emotional pain and suffering, manifesting itself through anxiety, loss of sleep, loss of appetite, loss of trust in authority figures, and general overwhelming malaise.

61. As a result of the actions of the defendants herein, plaintiff was forced to incur costs in the retention of an attorney, and various other costs associated with the efforts to have the children returned after they had been taken. She has required medication to deal with the stress and anxiety brought on by the removal of the children and the actions of

15

Complaint
Anderson v. Sonoma County
U.S. District Court - Northern Dist (S.F)
Case No.

defendants, and incurred medical expenses with regard thereto in the past, and is reasonably anticipated to incur further medical and/or counseling/therapy costs in the future.

62. Plaintiff contends that the actions of the defendants set forth hereinabove, were malicious and oppressive, undertaken recklessly and with deliberate indifference to her rights and relationships with her minor children E.A. and F.A., and as such, were actions deserving of an award of punitive damages against the individually named defendants.

## V.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
VIOLATION OF FAMILIAL ASSOCIATION – REMOVAL
(Plaintiff against Defendants)

63. Plaintiff hereby realleges paragraphs 1 through 59 as though fully set forth at this point, as such allegations set forth a cause of action for a violation of plaintiff's rights of familial association under the 14th Amendment to the U.S. Constitution, for the warrantless removal of E.A. and F.A. in the absence of any imminent risk of serious bodily injury.

64. Plaintiff alleges the damage allegations of paragraphs 60 and 61, apply to this cause of action, as well as the punitive damage allegations of paragraph 62.

### SECOND CAUSE OF ACTION
VIOLATION OF FAMILIAL ASSOCIATION – CONTINUED DETENTION
(Plaintiff against Defendants)

65. Plaintiff hereby realleges paragraphs 1 through 59 as though fully set forth at this point, as such allegations set forth a cause of action for a violation of plaintiff's rights of familial association under the 14th Amendment to the U.S. Constitution, for the continued detention of the minor children E.A. and F.A. by NEWMAN and COUNTY after their

removal by defendants, in the absence of any imminent risk of serious bodily injury, and as accomplished through the use of false and fabricated evidence, and the intentional actions of NEWMAN in failing to disclose exculpatory or contradictory evidence to the proposition of ORALEE abusing the children, in reports and testimony to the court.

66. Plaintiff alleges the damage allegations of paragraphs 60 and 61, apply to this cause of action, as well as the punitive damage allegations of paragraph 62.

**WHEREFORE, Plaintiff prays judgment as follows:**

1. For general, special, and punitive damages according to proof at time of trial

2. For attorney fees and costs as allowed pursuant to 42U.S.C. 1988.

3. For such other relief and damages as the court deems proper.


Dated: January 30, 2008                    /s/ Robert R. Powell
                                           Robert R. Powell, Esq.
                                           Attorney for Plaintiff