IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ORALEE ANDERSON-FRANCOIS,

    Plaintiff,

  v.

COUNTY OF SONOMA, CITY OF SANTA ROSA, JERRY NEWMAN, BRAD CONNERS, OFFICER HOOD, JOHN FELMAN, and DOES 1–25, inclusive,

    Defendants.

No. C 08-00724 WHA

**ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this civil-rights action, plaintiff Oralee Anderson-Francois, a foster parent, sues the County of Sonoma, the City of Santa Rosa and various county and city employees. Plaintiff contends that her constitutional rights were violated when Santa Rosa police removed two of her foster children and placed them in county custody following allegations of physical abuse. The city and county defendants each now move for summary judgment in their favor. Plaintiff, in turn, moves for summary judgment in her favor against Jerry Newman, a county child protective services employee, and Detective Brad Connors of the Santa Rosa Police Department. For the reasons stated below, the city's and county's motions for summary judgment will be **DENIED**. Plaintiff's motions will also be **DENIED**.

## STATEMENT

Plaintiff Oralee Anderson-Francois is repeat foster parent. She was seventy-four years old when the events at issue took place. She has adopted eight foster children, was a guardian for another child and has provided care and custody to more than 100 additional children (according to plaintiff, approximately 300). She also has nine biological children. In 2006,

two of her foster children were removed from her care and placed in county custody amid allegations of physical abuse. Plaintiff now sues the city and county under Section 1983 alleging that the removal violated her constitutional rights. Unless otherwise noted, the following facts are undisputed.

Defendant Jerry Newman was the Sonoma County Child Protective Services emergency response worker who conducted the investigation. Defendant Brad Conners was the detective in the Santa Rosa Police Department who (along with one other officer) executed the removal of the two children. Plaintiff sues the County of Sonoma and Newman, collectively referred to as "county defendants," as well as the City of Santa Rosa, Detective Conners and other police officers, collectively referred to as "city defendants." She asserts two claims, both predicated on her Fourteenth Amendment rights: (1) that the initial removal of the children, which was executed without a warrant on an emergency basis, violated her procedural due-process rights; and (2) that the continued detention of the children violated her substantive right of familial of association. This order addresses four motions: the city and county defendants each move for summary judgment in their favor on all claims, and plaintiff moves for summary judgment against Newman and Connors.

**1.   INVESTIGATION OF ALLEGED ABUSE AND REMOVAL OF THE CHILDREN.**

On December 16, 2005, two of plaintiff's adopted children, Marc and Lucas, both seventeen years old at the time and living elsewhere, went to the Sonoma County Child Protective Services ("CPS") office to report child abuse. They reported that plaintiff had abused them in the past and that, although they no longer lived with plaintiff, they were concerned for two of their younger (adopted) siblings, Frank and Erica (then thirteen and ten, respectively). The eventual removal of Frank and Erica from plaintiff's custody occasioned this lawsuit.

Newman opened an investigation into the allegations after being briefed by the intake worker. Newman reviewed plaintiff's file, which contained prior unproven allegations of abuse. Newman also contacted Lieutenant Fehlman of the SRPD to determine what information would justify removal. Newman also interviewed plaintiff and several of her

children. The children reported whippings with extension cords and belts, beatings with metal hangers, abuse with scalding water, threats (including with a handgun), and other types of abuse. During her interview with Newman, plaintiff denied the abuse and told Newman that the children suffered from various mental or emotional disabilities. She also told Newman that Marc and Lucas were using drugs, although the boys denied this. Over the course of the month-and-a-half CPS investigation, Newman also met with the children's doctor, school administrators and adult siblings, among others. Some described plaintiff as an attentive and caring mother, but others conveyed or intimated at signs of past physical punishment or abuse. Newman also learned that the family with whom Marc had been living at the time had kicked Marc out of the home soon before he reporting his concerns to CPS (Newman Decl. ¶ 6; Suntag Exh. D at 17; Powell Exh. A).

Newman testified at his deposition herein that Frank disclosed the beatings in these interviews. A few days later, however, Newman re-interviewed Frank and the child recanted, stating that he did not know what whipping meant. Frank stated that he had lied when he previously report abuse to Newman (Newman Decl. ¶ 8; Suntag Exh. D at 19–20; Compl. ¶ 44).

In accordance with interagency guidelines for child-abuse investigations, Newman undertook to arrange "forensic interviews" — *i.e.*, video-recorded interviews — of Marc and Lucas. The guidelines required the police to authorize such forensic interviews. Plaintiff therefore contacted the SRPD, and Detective Conners arranged the interviews. Forensic interviews of Marc and Lucas (the two 17-year olds) took place February 1, 2006. They were conducted by a trained interviewer while defendants Newman and Conners watched through a one-way window. Marc and Lucas again recounted numerous instances of abuse. These included whippings with extension cords and other previously reported instances of physical abuse that (they stated) had gone on for years, severe threats including a threat to poison Lucas and a threat to shoot Marc, and instances where plaintiff withheld meals from the children as punishment (Newman Decl. ¶¶ 9–14, Exh. 18 at 3, Exh. 110; Suntag Exh. D at 21–25, Exh. B at 5–9, Exh. 5 at 2–3).

3

**2.    STATE PROCEEDINGS.**

After the forensic interviews, the decision was made to remove Frank and Erica from plaintiff's care and, moreover, that the removal should be executed immediately, without waiting to secure a warrant or a protective-custody order. The parties dispute who was responsible for the decision.[1] Section 305 of the Welfare and Institutions Code permitted the police to remove children from their guardians without a warrant under the following circumstances:

> (a) When the officer has reasonable cause for believing that the minor is a person described in Section 300, and, in addition, that the minor has an immediate need for medical care, or the minor is in immediate danger of physical or sexual abuse, or the physical environment or the fact that the child is left unattended poses an immediate threat to the child's health or safety.

Section 300, in turn, set forth the conditions under which a child fell within the jurisdiction of the juvenile court for dependency proceedings. It provided (among other such categories) that:

> Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:
>
> (a) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian . . . .
>
> (b) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . .

On February 1, shortly after the forensic interviews, Detective Conners and another officer went to plaintiff's house. Neither Newman nor any other county employee accompanied them. The officers met with plaintiff and, thereafter, removed Frank and Erica and took the two children to the county children's center (Suntag Exh. B at 3, 13–14; Newman Decl. ¶ 16; Suntag Exh. 5 at 6; Suntag Exh. A at 3–6).

The county then instituted dependency proceedings in state court. When a minor is detained, California law required the county to file a dependency petition within 48 hours if the

---

[1] Defendants contend that, although Newman and Conners discussed the situation and both agreed that removal was appropriate, the decision to remove was Detective Conners' alone. Plaintiff seeks to pin responsibility on both.

4

child is to remain detained. This petition commenced the state dependency proceedings, *i.e.*, "proceeding[s] in the juvenile court to declare a child to be a dependent child of the court." Cal. Welf. & Inst. Code § 325, 332, 355. California law also required that a detention hearing be held in juvenile court within a day of the petition. Cal. Welf. & Inst. Code §§ 313, 315, 325. The purpose of this hearing was to determine "whether the child should be further detained" pending the dependency proceedings. *Id*. at § 315.

As required, on February 3 the county timely filed a petition to institute dependency proceedings, and a detention hearing took place Monday, February 6 (the following court day). Plaintiff was represented by counsel at the detention hearing. After reviewing the evidence, the court found that the children should remain detained. Its findings included that plaintiff had "physically abused minors with excessive corporal punishment," that there was substantial danger to the children's physical health, and that remaining in plaintiff's care would be contrary the children's welfare (Harvey Decl. ¶ 2; Harvey Exh. 100, 101).

The dependency proceedings thereafter occurred in two phases: an initial "jurisdictional trial" and a subsequent "dispositional hearing." The jurisdictional trial resulted in an order as to whether the child fell within the jurisdiction of the juvenile court — *i.e.*, "is a person described by Section 300" (quoted above) — whereas the dispositional hearing determined the "proper disposition to be made of the child" and constituted the appealable judgment. Cal. Welf. & Inst. Code §§ 356, 358, 360.

The outcomes of both the jurisdictional and dispositional proceedings were adverse to plaintiff. The eight-day jurisdictional trial began in May 2006. In a June 17 order, the court found jurisdiction over the children under both Section 300(a) and (b).[2] The dispositional hearing took place August 21, 2006, and resulted in a dispositional order that the children remain in county custody.

---

[2] These provisions required that each child "ha[d] suffered, or there [was] a substantial risk that the child [would] suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian . . . ." and that each "ha[d] suffered, or there [was] a substantial risk that the child [would] suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." Cal. Welf. & Inst. Code § 300(a), (b).

5

Reunification services followed. After approximately a year of such services, reunification reviews took place in May 2007. The juvenile court denied reunification on the grounds that returning the children to plaintiff's custody would create a substantial risk of harm to them. The court then terminated further reunification services.

Plaintiff filed two state appeals. Her first appeal sought review of the juvenile court's mid-2006 jurisdictional and dispositional orders as well as the February 2006 detention order. In a March 2008 order, the court of appeals affirmed the juvenile court. Plaintiff petitioned the California Supreme Court for review of that decision, and in September 2008 the Supreme Court denied the petition. Plaintiff also appealed the juvenile court's 2007 ruling denying reunification. In a June 2008 order, the court of appeal again affirmed the juvenile court's ruling (Harvey Exhs. 105, 107).

Plaintiff filed this action in January 2008. As stated, she sues the County of Sonoma, county child protective services worker Newman, the City of Santa Rosa, Detective Conners and other police officers. Claim One asserts that the initial removal of the children without a warrant violated her procedural due-process rights. Claim Two aserts that the continued detention of the children violated her right of familial of association. In her briefing, plaintiff clarifies that Claim Two alleges a violation *only* for the detention of the children prior to the first juvenile court proceeding — *i.e.*, for the five days from the February 1 emergency removal to the February 6 detention hearing (Opp. at 2). The city and county defendants each now move for summary judgment in their favor, and plaintiff moves for summary judgment against Newman and Detective Conners, respectively.

**ANALYSIS**

Summary judgment is granted under FRCP 56 when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A district court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there is any genuine issue of material fact. *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007). A

6

genuine issue of fact is one that could reasonably be resolved, based on the factual record, in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

**1. PRECLUSION AND THE ROOKER-FELDMAN DOCTRINE.**

Defendants first argue that preclusion or the *Rooker-Feldman* doctrine bar plaintiff's Section 1983 claims. Under the doctrine of collateral estoppel, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000). In the Ninth Circuit, state law is applied to determine whether a prior state court judgment will be given preclusive effect in federal court.[3] The elements of collateral estoppel in California are as follows:

> (1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated;
>
> (2) the first proceeding ended with a final judgment on the merits; and
>
> (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding.

*Ibid*.

The *Rooker-Feldman* doctrine is a well-established jurisdictional rule prohibiting federal courts from exercising appellate review over final state court judgments. It applies when a plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and it also "prohibits a federal district court from exercising subject matter jurisdiction over a suit that is a de facto appeal from a state court judgment." *Reusser v. Wachovia Bank*, 525 F.3d 855, 858–89 (9th Cir. 2008).

Both the preclusion and *Rooker-Feldman* arguments hinge in large part on whether the juvenile court's findings from the February 6 detention hearing constituted state-court review of the initial *warrantless removal* of the two children (in which case the matter was decided by the state court and plaintiff received adequate due process), or whether the February 6 hearing

---

[3] *See, e.g.*, *Khanna v. State Bar of Cal.*, 505 F. Supp. 2d 633, 647 (N.D. Cal. 2007).

7

1  instead addressed only the need for *continued detention* of the children going forward (in
2  which case the state court did not decide the propriety of the warrantless removal).[4]

3  As explained, California law required an expedited detention hearing when children are
4  removed from their parents on an emergency basis without a warrant. No decision has been
5  cited nor found squarely addressing whether the detention hearing passed judgment on the
6  propriety of the initial warrantless removal.

7  Section 315 of the Welfare and Institutions Code, which mandated the detention,
8  described its purpose in a forward-looking manner: "to determine whether the minor shall be
9  *further* detained." Section 319(e), which also detailed the requirements for detention hearing,
10 however, required the state court (among several other requirements) to "*specify why the initial*
11 *removal was necessary*" if the court ordered the children detained. But this is not quite the
12 same test as demanded by the Ninth Circuit, which is whether, at the time of the seizure,
13 defendants had "reasonable cause to believe that the child [was] in imminent danger of serious
14 bodily injury."

15 In order to invoke issue preclusion, it must be shown that the party to be precluded had
16 fair notice and a fair opportunity to litigate the issue. This record does not reveal the extent to
17 which plaintiff was put on notice that the warrantless aspect of the past conduct was to be
18 adjudicated at the hearing, *i.e.*, that the issue of whether there had been time to obtain a warrant
19 was in play at the Section 319 hearing. Section 319, by its terms, does not expressly require
20 that issue to be addressed. The closest it comes is in requiring the judge to "specify why the
21 initial removal was necessary" but this is not the same as "why the initial removal *without a*
22 *warrant* was necessary," the italicized point not needing to be resolved. Moreover, since the
23 entire proceeding is vastly expedited, there is no way plaintiff could have timely conducted the
24 discovery and investigation to show that officers had information on a timeline that would
25 have allowed for a short delay needed to obtain a warrant.

---

[4] Although Claim Two of plaintiff's complaint could be read to challenge the "continued detention" of plaintiff's two children during the entire dependency proceedings, in her briefing plaintiff clarified that she only challenges the initial warrantless removal of the two children and their detention prior to any involvement by the juvenile court whatsoever (*i.e.*, between the February 1 removal and the February 6 detention hearing).

8

As plaintiff emphasized at the hearing, the Ninth Circuit has arguably indicated that initial Section 319 detention findings do *not* bar subsequent federal damages actions complaining of the initial warrantless removal. In *Mabe v. San Bernardino County*, much like here, the plaintiff's children were removed without a warrant. An initial hearing was held the following day at which further detention was ordered. Thereafter, reunification services as well as the jurisdictional and dispositional phases of the dependency proceedings took place. The Ninth Circuit stated (albeit in a decision that did *not* address preclusion or a *Rooker-Feldman* argument) that "[t]he juvenile court's findings are not relevant to whether a sufficient exigency existed at the time of the removal to justify the warrantless action because such an inquiry is to be based on the information that Perry had at the time." 237 F.3d 1101, 1110 (9th Cir. 2001). The decision is unclear as to which "findings" it found irrelevant (the detention-hearing findings or the subsequent reunification, jurisdictional and dispositional findings) but the decision arguably supports plaintiff's position.

In any event, no decision has been cited nor found in which a Section 319 detention hearing or finding barred a subsequent federal claim regarding a warrantless removal. Because the juvenile court did not clearly rule on the pre-hearing exigency issue, even after the fact, *i.e.*, the propriety of the initial *warrantless* removal, and because no decision has ever found such a detention hearing to bar federal claims in these circumstances, this order finds that plaintiff's claims are not barred by collateral estoppel or the *Rooker-Feldman* doctrine.

### 2.  FOURTEENTH AMENDMENT AND IMMUNITY.

Plaintiff's two claims are both predicated on Fourteenth Amendment rights. Parents and children have a well-elaborated constitutional right to live together without governmental interference. The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies. Officials violate this right if they remove a child from the home absent "information at the time of the seizure that establishes 'reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.'"

9

*Rogers v. County of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007).[5] "Serious allegations of abuse that have been investigated and corroborated usually give rise to a 'reasonable inference of imminent danger sufficient to justify taking children into temporary custody' if they might again be beaten or molested during the time it would take to get a warrant. *Id*. at 1294–95.

The basic question is whether defendants had sufficient evidence of "imminent danger of serious bodily injury" when they removed the children in question from plaintiff's home without a warrant. Given that at least some defendants had known of the abuse allegations for months, it cannot be said as a matter of law on the present record that there was sufficient evidence to justify a warrantless search. At the same time, it cannot be said that there was not. The matter will have to be tried.

Plaintiff contends that the length of the investigation (approximately six weeks) indicates that there could not have been a true emergency. She points out that there had been no confirmed instances of abuse for weeks or months prior to the warrantless removal. She also emphasizes that Newman encountered some evidence tending to suggest that plaintiff was a caring or attentive mother, and she challenges the credibility of Marc and Lucas' abuse allegations. Defendants, for their part, emphasize that, based on their investigation, they believed physical abuse could recur at any time and that, after the forensic interviews, "serious allegations" of abuse had been investigated and corroborated. All of these, however, are factual issues inappropriate for adjudication on summary judgment. *Rogers*, 487 F.3d at 1294–98.

Defendants next contend that they are entitled to qualified immunity. A claim of qualified immunity requires a two-part inquiry: "(1) Was the law governing the official's conduct clearly established? (2) Under that law, could a reasonable [official] have believed the conduct was lawful?" *Rogers*, 487 F.3d at 1296–97. It is undisputed that, at the time the events at issue took place, the Fourteenth Amendment prohibited government officials from

---

[5] Unless otherwise noted, all internal quotations and citations are omitted from authority cited by this order.

10

removing a child from his or her parents absent evidence of "imminent danger of serious bodily injury," and that the right was well-established. *See id*. at 1294–97.

A reasonable officer would have understood that the law required a warrant under the circumstances presented by the current record. The investigation had taken nearly six weeks. The most recent alleged instances of abuse had taken place weeks if not months prior to the removal. There was no specific evidence indicating that the children were in *imminent* danger of abuse — only the mere possibility that, because plaintiff (allegedly) had abused her children in the past, she might do so again. No known danger required defendants to forego the few hours it would have taken to secure a warrant in order to prevent further abuse. This order therefore rejects the immunity defense.[6]

Finally, defendant Newman contends that he cannot be held liable for Claim One (the procedural due process claim for warrantless removal) because he did not personally participate in the removal of the two children. It is uncontested that Newman did not accompany Detective Conners to plaintiff's house and physically remove the children. Nevertheless, this order declines to hold, as a matter of law, that a county employee can be liable for a warrantless child removal only if he or she *physically* participated in the removal. Newman conducted the investigation into the abuse allegations. He contacted the police to initiate the forensic interviews. He provided input and recommendations to Detective Conners in support of emergency removal. The decision to remove the children was based in large part on his investigation and input — at least, the current record viewed in the light most favorable to plaintiff could so indicate. Plaintiff has established a triable of fact regarding whether Newman "integrally participated" in the alleged violation. *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004).

### 3. MONELL CLAIMS.

Plaintiff also sues the city and county. Section 1983 liability may be imposed on a municipality only where a municipal policy or custom is shown to have caused the violation.

---

[6] The county defendants also raise an absolute immunity defense, arguing that the state court has specifically authorized the detention. This order need not address the claim because, as explained, plaintiff has clarified in her briefing that she complains only of events that took place prior to any state court involvement.

*Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Plaintiff must show that policy or practice amounted to "deliberate indifference" to her constitutional rights and was the "moving force" behind the violation. *Anderson v. Warner*, 451 F.3d 1063, 1070 (9th Cir. 2006).

The city moves for summary judgment of the *Monell* claim on the grounds that plaintiff failed to establish any predicate violation. This order has found a triable issue of fact regarding whether city officials, acting under the color of state law, violated plaintiff's constitutional rights. The city's motion for summary judgment of the *Monell* claim is therefore denied.

The county's motion is also denied. The record, viewed in the light most favorable to plaintiff, suggests that the county had virtually no training regarding the warrant requirement and what constituted "exigency" to guide its employees as they undertook sensitive decision of whether or not to remove children from their parents. It also indicates that the warrants were rarely obtained before children were removed from their parents (Powell Exh. A at 55–57; Powell Opp. Exh. D at 25, Exh. E at 16, 21). Such circumstances, if proven to be true, could support a finding that the county was deliberately indifferent to plaintiff's Fourteenth Amendment rights and that its failure to train its employees was the moving force behind the alleged violations. Plaintiff has identified a triable issue of fact on her *Monell* claims.

## CONCLUSION

For all of the above-stated reasons, the city and county's motions for summary judgment are **DENIED**. Plaintiff's motions for summary judgment are also **DENIED**.

Dated: May 22, 2009.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE